Mr. Bell, we'll hear from you first. We appreciate your willingness to accept the appointment in this case under the Criminal Justice Act, and you may proceed. Thank you, Judge Colleton and Judge Benton and Judge Woolman. My name is Justin Bell. May it please the Court, I represent Tracy Jones in this matter. For the Court, our two issues, those issues succinctly stated are, one, the District Court error in denying the government failed to bring Tracy before a magistrate judge for an initial appearance for 37 days after being taken into federal custody. The second issue is, during the historical interrogation of Tracy, did the Court employ a two-step interrogation tactic by Missouri v. Siebert? I'm going to turn to the first issue first, but certainly if the Court has any questions as it relates to the second jump in and tell me that, I'm happy to address that first as well. But before we go on to the legal argument, I do want to address one thing regarding the standard of review regarding the first issue. There's some confusion, although I think we're not too far off between the government and the defense in this issue. It's plain, you know, we both agree that the standard review on a motion dismisses the noble, as stated by both of our briefs. But then the government also states that the normal, if it's a question of fact, is reviewed as clear, for clear error, clearly erroneous standard. But I just want to note that the Court has made clear on multiple occasions that the question of whether or not a case shocks the conscious is a question of law. That final analysis, a question of law, is not a question of fact. It's reviewed for, under the noble standard of review, and this Court should not give deference to the trial court or the district court's opinion on that matter. So then turning to the actual case at hand, I think the, you know, the important thing here is that in Hayes, this Court has already held an analogous 38-day detention with a violation of Naresti's substantive due process rights under the shocks to the conscious standard. I think that's the starting point and the precedent that the Court should look to moving forward. Well, that's a 1983 case, right? Correct. That's a civil case. What about our long line of cases that say that dismissal is not the appropriate remedy here? Yeah. That's a good question, Your Honor. I think that's the focus of the government's brief. I would say all that case law relates to Rule 5a. It's a statutory analysis, right? And so this is similar to what the Court has done. Just to be precise, Rule 5a isn't a statute. It's a rule of procedure. But I think you mean it's analysis under that rule rather than under the Constitution. Yes. And I apologize, Your Honor. Yes. The Rule 5a is a court rule. It's analysis of what is the proper remedy under the court rule. That is a separate basis than what is required under the substantive due process clause of the United States Constitution. Well, I don't know what clause that would be, but there is a doctrine, I guess you could call it. Fair enough, Your Honor. The due process language and the Fifth Amendment and the substantive due process. Due process clause. Yes. And so under the due process clause and the subsequent substantive due process analysis thereof, we would submit that there is reference on several cases, both in the United States Supreme Court and the Eighth Circuit, of the outrageous government conduct rule relating to the substantive due process line of cases or the due process clause of the Fifth Amendment. So certainly, and that's why we're not arguing that the appropriate remedy under Rule 5a or the McNab-Mallory rule or under 18 U.S.C. 3501, which is what the government spends a lot of its brief talking about, we're not asking for relief under that. What we're stating is solely that, at least as it relates to dismissal, that dismissal is appropriate under the outrageous conduct rule, outrageous government conduct rule for the exact same reasons that this Court held that it would be a substantive due process violation in the 1983 case. And the reason for that is the standard is the same. The standard for undersubstantive due process for a 1983 claim is whether or not it shocks the conscience of the Court, whether it shocks the universal sense of justice. And under the outrageous government conduct rule, which is rooted in the substantive due process or the due process clause, the same analysis, it's the same standard. It's whether or not it shocks the conscience of the Court. And so, and I think that's interesting because the trial court and specifically the magistrate court cites to the fact that, cites to Hays, cites to the fact that there could be a potential civil remedy here as relates to my client. But it doesn't distinguish the fact that why would it be any different? Why under the substantive due process or the substantive due process analysis and under the due process clause of the Fifth Amendment, why would there be a difference between the two? We would simply state that, you know, this Court's already made the determination for that. And certainly, Judge Bente, I think you have, it's a great point, and it's an That's not the remedy that we've addressed in the past. I'll say two things regarding that. One, once again, we're not arguing the Rule 5A analysis that was addressed by those courts. And number two, I think this is a more extreme violation than a lot of those cases. A 37-day, a lot of the cases are eight days. Some are different. I mean, there's a difference. Well, you agree that the standard in our cases is most intolerable government conduct, right, is required. Right. And I think most of the case law that talks about that says the preceding sentence before that is, you know, that it shocks the conscious, that it's the most intolerable. I think I would say that the most intolerable conduct is a way of defining conduct that shocks the conscious of the court. I mean, the shocks the conscious standard is a difficult standard to meet. It's supposed to be a difficult standard to meet, whether it's a civil case or a criminal case. Does it have to be more than negligence? Yes. I would say absolutely it has to be more than negligence. But I think wanton conduct would apply. And in this case, leaving someone in jail for 37 days prior to getting an initial arraignment is wanton conduct. I mean, that's over a month. Counsel, there are a few people that want to be in jail. Does that affect it? I don't think my client would want to be. They're homeless. They like that. They like things about it. Sincerely. That's a good question, Your Honor. And I would say, one, first of all, my client did not want to be in jail. But, well, now, compared to Hayes, did your client protest during this period of time? Yes, she did. But I think more importantly, looking at the constitutional analysis, I don't know if it matters. Because the Fifth Amendment, I mean, if there's ever a blatant violation of the Due Process Clause, it's taking somebody's liberty without ever even going before a judge. I bet you've read Hayes. Yeah. You know what Hayes said. Hayes cited the rules, cited everything. Statutes. Wrote the jail administrator many times. The jail administrator told him, I started to say, get lost. That's not quite correct. I hope you get your court date. Write somebody else about this. And things like that to him. You don't have evidence of that in this case, correct? Your Honor, you know, the evidence, at least presented by counsel, was that there were proffers made regarding that. Now, I was not trial counsel as it relates to this matter. That was handled by a separate lawyer. But I would submit that the... Well, what was the evidence? You know the record, right? Yeah. I mean, the evidence by way of what was said by my client was by proffer. Okay. It was that the... And there was an attempt and there was discussion about that she was reaching out to the Federal Public Defender's Office to try to get... The Federal Public Defender's Office obviously had not been appointed at that point because she didn't have a lawyer. But that's how, essentially, this was essentially uncovered in the first place as it relates to the matter. And so... But there was not a witness from the Federal Public Defender's Office. That's true, Your Honor. And there was not a... My client was not called to stand to discuss what actions were taken based off of that. But I would submit... What did the government witnesses say about what they did? Well, that's a good question, Your Honor. I mean, there's a kind of evolving standard of what they said happened. They first started saying that, well, we told... The first thing is, well, we told the magistrate judge's scheduler. And that just wasn't true. There was evidence that came out that that never happened. And then it was like... Then it was, oh, well, I thought someone else called. And then that became not to be true. And then eventually they just kind of gave up and said, well, nobody called and nobody did anything. And there was admission, essentially, to at least a Rule 5a violation at that point. So it essentially took the day of the hearing for them to get to that point, which I think goes to show the careless, wanton, negligent acts that were taken by the marshals. I mean, even as of the day of the hearing on this, they still didn't know why someone sat in jail for 37 days prior to having a hearing or an initial appearance on this matter, Your Honor. So, you know, with that, I mean, I think I've made the argument for that issue. I do want to address the Siebert, Seibert, I've heard it pronounced both ways, but I think it's pronounced Siebert issue. You know, this is a pretty straightforward issue. There's a recording of the interrogation. There's a transcript of the interrogation in the brief as it relates to this. You know, it is apparent from looking at, and it's pages 18 through 20 of my brief that discusses what was said, but there was a short but very important discussion with my client from the FBI agent in the interrogation. It essentially is, it doesn't use the term Rule 35, but it essentially is saying, you know, the way that you have to get below a mandatory, here's the charge, the way that you have to get below the 10-year mandatory minimum is to talk with me. Here's your chance to talk with me, and there's some discussion back and forth with that to where we can go to the district court judge and we can ask to go below the 10-year mandatory minimum. And we can talk about that. Before we talk about that anymore, I need to read you your Miranda rights as it relates to this. The intent of that, plainly, is to try to convince the person to waive their Miranda rights prior to giving them Miranda rights and then subsequently leading to a confession that relates to it. That type of tactic, it's one thing, it's done all the time, right? I'm not saying that having the conversation about cooperation is in and of itself coercive, but the problem is using a two-step analysis, or two steps, as counsel does, and I learned this very tremendously from Siebert. There was an hour, an hour and a half, right, of discussing. She gets a Coke and, no, excuse me, a coffee and a sandwich and comes back in and says, let's put down what we said before. I mean, it doesn't compare to the two steps in the cases, correct? I think it's true that the facts are different, no doubt about that. We're talking about an hour-long discussion. We're talking about a confession in Siebert that came first and there wasn't one. But I think the intent is the same. I think that the intent here is trying to use pre-Mirandaized conversations in an attempt to get someone to waive their Miranda rights and get a confession. Whether or not you're right, you're absolutely right, they're different facts, but the analysis in the Siebert decision is you can't do that. You can't use pre-Mirandaized conversations to get someone to waive their Miranda rights. Justice Kennedy's concurrence controls, and it talks about the intent of doing it. You know what I'm referring to here, right? Correct. Okay, good. That isn't apparent here, right? How long, is there an estimate of how long it took before the rights are given here? Your Honor, I would say. Not very long. It's one, two, three pages. It's a few minutes. Yeah, it's a few minutes. How long did you say, estimate? How long did you estimate? A few minutes, Your Honor. A few minutes. Yeah, it's not. I'm not pretending that it's hours. It's the focus of what the intent is, right? Was there a finding about intent, a factual finding, one way or the other? No decision was made about that, Your Honor, that I recall in that. With that, Your Honor, I'm going to reserve the remainder of my time for rebuttal. Okay, you may do so. Thank you. And we'll turn it over to the government. Thank you. All right, Ms. Nelson, we'll hear from you. May it please the Court, Counsel, I'm Gina Nelson. I am here on behalf of the United States of America for the District of South Dakota. Let's be clear here. There was a Rule 5a violation. There was. It's very regrettable. It's unfortunate. But this case is really about the remedy and if there should be one. The failure to. The Court got it right when it said the failure to present Jones to a magistrate should not result in a motion to dismiss. And further, the defendant's suppression statements should not be, or statements should not be suppressed. The Court has read the briefings. The defendant has not cited one criminal case in which a case was tossed out based on a delay in presentment. Instead, she relies on civil cases involving 1983 claims, civil cases which also have more egregious facts and involve civil penalties. The reason the defendant is unable to cite a criminal case on point is that dismissal is not a remedy. And the defendant does allege the two violations, the Rule 5a and a due process violation. If we look first at the Rule 5a violation, you're looking at this being a procedural rule. So, of course, no dismissal, but potentially suppression under the right scenario. He's made clear today that he's not arguing that the violation of the procedural rule calls for dismissal. He's arguing that there was a constitutional violation. So I think it would be more helpful to address whether there's a constitutional violation, and if so, whether that warrants dismissal. And the cases, again, cited by counsel are civil 1983 cases, and in fact are much more egregious than what's in front of this Court. There's no question on the record that this was completely inadvertent. The point about a proffer by a defense counsel or something, there's nothing that shows that she protested in any way that she was in custody for this long. And, in fact, the minute I knew that it was, she was in custody, I had arranged for her to see the judge. But you're right. Maybe she wasn't familiar with Rule 5a. She was just put into prison or jail. And that is correct, but under the due process. What obligation does she have to ask for a presentment? Well, if you're looking at 5a. No, I'm looking at. The due process argument. Yeah. Okay. Well, the due process argument, you know, if you look at the Hayes decision, for example, that counsel cites repeatedly, in that case, the Court routinely, consistently discusses deliberate actions on behalf of law enforcement. They, the. It's the jailer, right? That's correct. Not law enforcement, the jailer. Yes. The jailer. Yes, that's correct. And those people knew that she was in custody and let her sit. You know, essentially, they blew her off. And that is starkly different than what's happened in this case. The minute they were told that she was in custody, that I was told, she did see. It was corrected. No. And the jailer, there's no record of the jailer being aware of that or that law enforcement was aware of that. It was inadvertent. Aware of what? I mean, didn't the jailer know that the woman was in the jail? I don't know what you mean. Well, the marshal service did, and then the FBI and task force, they thought that the ones that thought she should see the judge thought she had seen the judge, the ones that notify, that make the court notifications. So what happened here was, and this was back in the days of COVID, so things were a little bit different. The persons were not being transported over to court, so the process of notification was not as good as it is back to normal now. Now, a task force puts the person into custody, and then the task force officer notifies the clerk of courts, judges chambers, the United States Attorney's Office, as well as the marshals. All those people are notified. All that stuff has been remedied. In the days of COVID, because the individuals were appearing via video from the jail, the right people were not, in fact, notified that she had not seen the court. It was inadvertent, and everything on the record shows. I was thinking of that movie. I heard some Humphrey Bogart movie years and years ago when the police shot the wrong person, and their excuse was, most regrettable. Is that your analysis of this? Most regrettable. Or don't you want to concede either of that? I don't know if I concede most regrettable when you look at some of the case law. It is regrettable. I mean, nobody wanted this to happen. It was before I was Brown County State's attorney. I was court appointed. They had no separate conference rooms, so they locked me in the jail with this person. It got to be about 4.30, and nobody came to let me out. And that was most regrettable. Yes, that's most regrettable. I'm so sorry. The other prisoners were merriment. I knew I'd get out at 5 o'clock because they would bring the bologna sandwich around for my client. Most regrettable. It is. I'm trying to think of the verse from a hymn, but I'm not going to quote any hymns to you, although I'd be capable of doing it. It's regrettable. It is regrettable. Most unfortunate. We'll use that. It is unfortunate. You don't like the word most. No. You're happy with regrettable and unfortunate and not most unfortunate that this lady was sitting there? It's unfortunate, but it was not deliberate, and I think that is the key difference. It was not deliberate. And when you look at the case law in this area, that is the key, deliberate conduct. And even then, when that is the case, you have to – Wasn't the case about deliberate indifference, not deliberate – Yes, and there was no deliberate indifference here. It was not deliberate. What kind of indifference was it here? A mistake. The case law supports that, even obnoxious police conduct. When did this happen? I've forgotten where this happened. November of 2020. And in which city? In Rapid City. She was arrested in Martin. I know that now. In Martin, South Dakota. I'm tempted to quote scripture, but I won't, about Rapid City. I've said too much already, I suppose. She was in Martin, South Dakota, and was arrested, and then she was brought to Rapid City the next day. But if you look at the case law under the due process argument, even obnoxious police behavior or flagrant misconduct is not enough to establish outrageousness in a constitutional sense. Physical and or psychological coercion of violence or brutality to the person must be shown to transgress a defendant's right to due process. And if you look at the findings of Judge Moreno, the magistrate – I suppose we could vent our discontent with what happened out there with strong language that no police officer or jailer would ever pay any attention to. And you can't embarrass the Rapid City people, I suppose. Disregard that remark. No, I – I voiced it. I understand what you're saying, Your Honor. And, again, this was actually – this was not Rapid City law enforcement. This was the FBI and an Oglala Sioux Tribe Department of Public Safety Task Force. I won't say it again. But they – I mean, they made a mistake. But the case law is not in favor of a dismissal here. It just – that's not the remedy. The remedy is not dismissal. Again, there may be a – Well, let's see. What remedy do you suggest? Remedy? If there was a remedy, the remedy – What remedy does this person have? Okay. There's – so if we want to focus on the – under 5A, the remedy would be suppression. If taken between – I'll just note this real quick. If taken between the period of violation and initial appearance arraignment, there was no statement taken during that violation period. The statement was taken immediately after arrest within two hours. I'd also note – well, I'll come back to that. Then the due process. The remedy is potentially civil remedy, a 1983 claim. However, I would submit, but I'm not here on that argument, or on a 1983 case, there's much more egregious facts that did not support a 1983 claim. Here, the facts just do not support that. But that – How do you – let me interrupt one more time. How do you respond to the Hayes v. Faulkner County case? In the Hayes v. Faulkner – I don't think you acknowledged in your brief. I didn't, because I see it as something that is so starkly different. Well, you should at least say something about it. Well, it – If it's different, then you should explain it. That's – It was featured by the appellant as the leading constitutional decision. That's – in Hayes, it's a 1983 action. The person was taken into custody for traffic tickets, not a – not having been indicted by a federal grand jury for a 10-year mandatory minimum case. But then – What difference does that make? Well, they're then just finding a probable cause by a grand jury. But which – No presentment required under either scenario? Yes, but in this case, the facts were more egregious. But more importantly, in Hayes, it focuses on deliberate actions again and deliberate indifference. It focuses on whether that shocks the conscience, whether the actions by law enforcement shock the conscience. And the – in that case, with the person just basically saying, so, you know, sorry you're in custody. Somebody else's job to figure that out for you. And they still just let her sit or him sit for a long time. That – the facts in that were different, were quite different. The other thing I wanted to quickly address – This lady was in longer, wasn't she, than Hayes? No, Hayes, I believe, was – I think, if I recall correctly, there was a couple different ones cited by counsel. But I believe it was 38 days. And how long was this one? 37. All right. So 37 I had, but – The other point that I wanted to talk about is the defendant's argument about Missouri v. Siebert. Two minutes is how long occurred between – Now, counsel, what do you rely on for that? I just tried to look for the time. Is there a finding on the time? There was – I don't know if he says specific time. I would say that the audio recording – This is a transcript of something. Yes. Is the – how long the something was in the record anywhere? From my recollection, there was not a specific time. I think he refers to it more as shortly. A few minutes. Yes, but I would say that the recording was submitted as evidence. And if you listen to that within the first two minutes, Miranda's given. And then Miranda is – there's no – in that timeframe, there's no discussion of, you know, what she did to distribute drugs. It's just a simple colloquy of, hey, this is what's going to happen, that kind of thing. And then, boom, they go right into questioning – or, morandizing her and then questioning her. Both Missouri v. Siebert and Aguilar, cited by defense, are, again, starkly different. In both of those, they use that question-first tactic where they ask them all the questions about the crime, and then they morandize them, and then they ask them all the questions about the crime again. This is simply not what happened in this case at all. There's nothing in the record that shows they asked anything about her drug dealing or that of others before she was morandized. Well, they do tell her to talk truthfully, and we do something on the Federal side in front of a judge for you. I can explain more to you if you want. And then they do the morandizing. I guess that's the most coercive thing they say. Yes, and the judge found that they were just – essentially, he kind of regarded it as – I mean, it wasn't a promise made to her. There was just basically saying, hey, it's a good idea. He viewed it as it's a good idea to tell the truth. Well, he talks about – mostly focuses on the whole interview and how nice the whole interview was, how cordial. Yes. There are findings on that very clearly. Yes. And how voluntary it was. And, of course, the evidence in Siebert was about the same, that the second statement was very voluntary and they got along very well. She had the coffee and the sandwich in the middle of it and all that, and the Supreme Court didn't care about that very much, right? And that's correct. I think those key differences, that period of questioning where they got him to confess without ever advising him of any rights, and they basically spilled their guts, and then, you know, they talked and talked and talked until they talked. Then they went back and morandized it to sort of fix it. Here, that just did not happen. Let's see. I'm tempted to characterize your argument, which is stated much more eloquently and loyally than this, but I'm tempted to characterize your argument about what happened here as stuff happens. I mean, respectfully, I disagree in, you know, this was an anomaly. Does the record reflect that? Is there any real record on that? I noticed that your point points to a couple of cases, district court cases, but is there any real record about how often this happened during this period of time? I know it's a blame it on the pandemic, but is there any record here on that? The only thing I can offer to the Court is that in the Western Division of the District of South Dakota, this is the only- Well, you're testifying, I think, counsel. I'm talking about is there anything in the record? No. I didn't see it either. Go ahead. No. Proceed. There's nothing in the record that shows any other violations in the Western Division. I would say that. And why is State, again, if you could, in summary, why there was not deliberate indifference here by the officers who were supposed to take her to the judge? Because they made a mistake. They thought they did. They thought the judge was notified. How does that happen? They thought she was notified, but how could the officer think that if he didn't make the notification? Well, that is part of the issue. There was approximately five, I believe, task force officers. They thought the one had done it. He didn't. He thought the others had done it. It was a mistake. In fact, so much as they sincerely thought that they had told up to really the hearing, the time of the hearing, they were so certain that somebody had called because it was so routine for them. They have such a process in place that they call that this was just something very, it's just an anomaly. It's something that doesn't happen. They thought that they had notified chambers, and they very much thought that up until really the date of the hearing on this matter. And how did it come to light eventually? Well, there was no record of it. There's no, the phone records and things like that showed that there was no call. And how did it come to light that she needed an appearance? The FBI agent came to my office, spoke to me, and said, hey, you know, what were Tracy Jones' proceedings? And I said, what do you mean? And essentially he said, well, she was arrested, and we notified him, and I never heard of a court date or anything else from that. And I did not know that. So the minute that when I found out that day is when she had her initial appearance. I notified that. And the FBI agent went to the U.S. Attorney's office to check on the status of the case? When he was there, yes. Probably for something else, yes. Only in Rapid City. All right. Thank you for your argument.  You seem to be quite amused by the case. Well, I guess we're not here to judge you, but anyway. Thank you. Mr. Bell, we'll hear rebuttal. Thank you, Your Honors. You know, I would start by saying that I think the idea of the officers, the agents in this case, still thinking as of the date of the hearing on this is not evidence of not deliberate indifference. It's evidence of deliberate indifference. If you don't care enough about this to get your story straight, essentially, and figure out what actually happened prior to the day of hearing and just say, well, we did it, we did it, and then require someone to get the judicial phone records and the e-mail records to determine the fact that, no, you didn't do it, I think that's... Don't we have to judge deliberate indifference as of the date that she was detained? I don't know if you can... Well, I think in this case... ...get their hearing preparation. I think it would be the date that she was detained through the 37 days that she was in custody, yes. Yeah, but you're talking about after that. Correct. But during that time frame, nobody ever had any kind of checking on this. Nobody looked at it. Nobody did anything. I mean, and I understand that it was a serious charge, but, you know, the person was set for 37 days without judicial process in custody over those things. What might be missing here is somebody who actually knew that she hadn't been presented and disregarded that. As I understand, the government's position is these agents all claim they thought somebody else had made the notification. I mean, I think it's... I would submit to the court that it's want behavior to just say, well, someone else has to do it. You have to have some evidence that you were attempting to make this person, to make sure that this person had a judicial initial appearance. Yeah. So with that, Your Honor, unless there's any questions, I will sit down. Thank you for your time. All right. Very well. Thank you for your argument. The case is submitted and the court will file a decision in due course. Thank you to both counsel. You are excused.  Thank you. 22-3036. Commercial Beg v. Land O'Lakes. Thank you. All right. Good morning, gentlemen. Thank you.